UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JAMES E. PLASTOW, JR. and
ISABELL JUNE PLASTOW,

              Plaintiffs,                              Case No. 1:10-cv-703

v.                                                HON. JANET T. NEFF

LAWYERS TITLE INSURANCE CORP.,

              Defendant.
_____/

## OPINION

Plaintiffs James and Isabell Plastow, the insureds under a title insurance policy issued by Defendant Lawyers Title Insurance Corporation, filed this diversity action, seeking a declaratory judgment that Defendant was obligated to defend them against the claims asserted in an underlying real property litigation and indemnify them from any losses or damages occasioned thereby under the title insurance policy and further asserting a claim for breach of contract as a result of Defendant's failure to do so. Pending before the Court is Plaintiffs' Motion for Partial Summary Judgment (Dkt 24), to which Defendant filed a response (Dkt 29) and Plaintiffs filed a reply (Dkt 32). The parties have also since filed supplemental briefing (Dkts 35-37). Having fully considered the written briefs, detailed stipulated statements of fact, and accompanying exhibits, the Court finds that the relevant facts and arguments are adequately presented in these materials and that oral argument would not aid the decisional process. *See* W.D. Mich. LCivR 7.2(d). For the following reasons, the Court concludes that Plaintiffs' motion is properly granted.

## I. BACKGROUND

On January 30, 1980, Plaintiffs purchased a parcel of real property in Banks Township, Antrim County, Michigan described as Lot # 1, White Pine Shores Subdivision (hereinafter, the "Property") (SMF[1] ¶ 1). The plat of White Pines Shores subdivision was filed with the Antrim County Register's Office on September 9, 1955 at Liber 2 of Plats at page 83 (*id.* ¶ 2). It shows the Property (i.e., Lot 1) as being the northernmost lot in the subdivision, depicts the Property's north and south boundaries as running in straight, essentially east-west lines for their entire length, and identifies Lake Michigan as lying immediately west of and bordering the Property (*id.*). In addition, the Description of Land Platted states, "The above description is intended to include all land to the water's edge of said Lake Michigan" (*id.*). Thus, per the Plat, the north and south boundaries of the Property run to the water's edge of Lake Michigan and Lake Michigan forms the west boundary of the Property (*id.*). In this regard, the Property as described in the Plat included approximately 106 feet of beach and lake frontage (*id.*).

In conjunction with their acquisition of the Property, Plaintiffs obtained a Policy of Title Insurance from Defendant ("the Policy") (SMF ¶ 3). Schedule A of the Policy (1) establishes a "Date of Policy" of December 18, 1979; (2) identifies Plaintiffs as the insureds; (3) characterizes the estate or interest described and covered by the Policy as "Fee Simple"; and (4) describes the land referred to in the Policy as, "Banks Township, Antrim County, Michigan, Lot 1, White Pine Shores, according to the plat thereof as recorded in Liber 2 of Plats on page 83, Antrim County Records,

---

[1]Plaintiffs' Statement of Material Facts (Dkt 25-2), Defendant's Counterstatement of Facts (Dkt 30-2).

being a part of Sections 25 and 26, Town 32 North, Range 9 West" (*id.*).  As originally issued, the

Policy provided Plaintiffs $25,000.00 in title insurance (*id.*).

The Policy provides:

SUBJECT TO THE EXCLUSIONS FROM COVERAGE, THE EXCEPTIONS CONTAINED IN SCHEDULE B AND THE PROVISIONS OF THE CONDITIONS AND STIPULATIONS HEREOF, LAWYERS TITLE INSURANCE CORPORATION, a Virginia corporation, herein called the Company, insures, as of Date of Policy shown in Schedule A, against loss or damage, not exceeding the amount of insurance stated in Schedule A, and costs, attorneys' fees and expenses which the Company may become obligated to pay hereunder, sustained or incurred by the insured by reason of:

1.    Title to the estate or interest described in Schedule A being vested otherwise than as stated therein;

2.    Any defect in or lien or encumbrance on such title;

3.    Lack of a right of access to and from the land; or

4.    Unmarketability of such title.

(SMF ¶ 4).  Schedule B of the Policy further provides, in pertinent part, that

[t]his Policy does not insure against loss or damages by reason of:

1.    Rights or claims of parties not shown of record.

2.    Unrecorded water, mineral and oil rights, unrecorded easements and claims of easement, boundary line disputes not disclosed of record and any matters which would be disclosed by an accurate survey and inspection of the premises.

* * *

11.    Rights of the public and adjacent and abutting property owners in that portion of the premises lying along Grand Traverse Bay.

(*Id.*)

In October 2007, Defendant issued a blank endorsement to Plaintiffs, amending Schedule A of the Policy to increase the amount of title insurance stated therein to $500,000.00 (SMF ¶ 5). Plaintiffs built a house on the Property in 1980-81 and used it as a summer cottage through 2006 (*id.*). Plaintiffs subsequently made the Property their primary residence and built a new house in 2006-07, occupying it in late July 2007 (*id.*). In conjunction with the planning and construction of their new house, Plaintiffs caused a site plan survey of the Property to be prepared in December 2004 (*id.*). The 2004 site plan survey depicts the north and south boundaries of the Property as extending to the west, in a straight, essentially east-west line, to the shore of Lake Michigan, thereby encompassing the beach in front of and immediately west of the rest of the Property (*id.*). In this regard, the 2004 site plan survey was consistent with other surveys of the Property with which Plaintiffs were familiar, i.e., that the north and south boundaries extended to the west to the shore of Lake Michigan and encompassed the beach in front of and immediately west of the rest of the Property (*id.* ¶ 8).

Plaintiffs' Property is bordered on the north by a common park for the residents of Timberlane Terrace, a subdivision lying immediately north of White Pine Shores (SMF ¶ 9). The Timberlane Terrace Plat was filed with the Antrim County Register's Office on June 18, 1958 at Liber 2 of Plats at page 95 (*id.* ¶ 10). Lots 37-46 and the lot identified as "Private Park" lie along and abut the north boundary of Plaintiffs' Property (*id.*). Depending on the location of the shore of Lake Michigan at any given time, if the north boundary line of Plaintiffs' Property is extended in a straight line to the west to the shore, it cuts off the Timberlane Terrace Park's beach access and its access to the shore through the beach (*id.* ¶ 12). By the same token, if the northwest boundary

4

line of the Timberlane Terrace Park is extended in a straight line to the southwest to the shore, it cuts off Plaintiffs' Property's beach access and its access to the shore through the beach (*id.*).

Before 2007, Plaintiffs observed "sporadic" or "occasional" use of the beach in front of and immediately west of the rest of the Property by people coming from Timberlane Terrace (SMF ¶ 13). After Plaintiffs occupied their new house in the summer of 2007, there was a marked increase in the use of this portion of the beach (i.e., the beach between the north and south boundaries of the Property as extended to the shore of Lake Michigan) by people coming from Timberlane Terrace (*id.* ¶ 14). According to Plaintiffs, individuals walked on a straight path down to the water (*id.*). In response to these repeated incursions on what they understood and believed to be their property, Plaintiffs caused a line of boulders to be placed immediately to the south of the Property's north boundary, out along the beach to a point just shy of the ordinary high water mark (*id.* ¶ 15). Despite Plaintiffs' efforts to delineate what they believed and understood to be the Property's north boundary, residents of Timberlane Terrace have continued to use the beach lying between the north and south boundaries of the Property as extended to the shore of Lake Michigan (*id.* ¶ 16).

In early July 2008, on behalf of 41 Timberlane Terrace property owners, Rick Luther, a Timberlane Terrace property owner, wrote Plaintiffs a letter, which provides the following:

> Let me begin by stating that your actions of painting, grading to create a path across our beach, and placing of boulders are at the least presumptuous. We have contacted legal and riparian experts and they have concluded that the line you marked with paint and boulders is not based on present Michigan and federal law.
>
> The law is very clear in cases of relicted property and converging property lines. It states clearly that the overriding concept for establishing property lines is proportionality and equity. This concept has been reconfirmed in recent cases. To accomplish fair and proportional boundaries, our experts advocate bisecting the meander point that separates our plats. This would substantiate the approximate lines we have used for the last 50 plus years. If you feel you need boulders to delineate your property line please move them to that line.

5

(SMF ¶ 17). Luther's letter was accompanied by a sketch depicting the proposed bisection of "the meander point that separates our plats" (*id.* ¶ 18).

Upon receipt of Luther's letter, Plaintiffs wrote Defendant a letter dated July 10, 2008, requesting a defense and indemnification (SMF ¶¶ 19, 21). Plaintiffs sent another letter on July 16, 2008, providing Defendant with aerial photographs of the area in question and additional surveys (*id.* ¶ 20). Defendant acknowledged receipt of Plaintiffs' claim for a defense and indemnification, advising that it was in the process of investigating the claim (*id.* ¶ 22).

On August 17, 2008, Plaintiffs communicated with Defendant again, through faxed correspondence, stating:

> I last spoke to you on 29 July 2008. Since that time my neighbors to the north have become more aggressive in their encroachments on our property. This has resulted in the necessity for me to retain counsel. It is my belief that I should have not had to incur this expense and that these attorneys will only be doing the work that my title company should be doing on our behalf. I have tried to contact you on 13, 14, and 15 August with no results, hence this FAX. If you intend to deny me representation then I ask you to set out the basis for your denial formally in order that I may review the basis with my attorneys.

(SMF ¶ 23). Defendant did not respond (*id.*).

Shortly thereafter, Plaintiffs received correspondence from an attorney representing various Timberlane Terrace property owners concerning the Timberlane Terrace Park (SMF ¶ 24). The letter provided that "the property owners of Timberlane Terrace are concerned about the recent actions on the beach area commonly used by members of Timberlane Terrace for the past 50 years. In order to document the historical use of the beach in the record, my clients have filed an affidavit affecting real property with the County Register of Deeds" (*id.*). A copy of the affidavit, executed by more than 40 Timberlane Terrace property owners, accompanied the letter (*id.*). Through the affidavit, the signatory Timberlane Terrace property owners described their purported use of the

6

Timberlane Terrace Park to access Lake Michigan and recreate on the beach in front of and immediately west of the rest of the Property since 1958 (*id.*).

On August 29, 2008, Plaintiffs filed suit against all 87 Timberlane Terrace property owners in the circuit court for the County of Antrim, Michigan: *Plastow v. Randall, et al.*, No. 08-8408-CH (SMF ¶ 26). Plaintiffs asserted claims against the property owners for quiet title, trespass, slander of title, and quiet enjoyment, all seeking similar relief to the effect that Plaintiffs owned the beach lying between the north and south boundaries of the Property as extended to the shore of Lake Michigan, i.e., the beach in front of and immediately west of the rest of their Property (*id.*). In support of these claims, Plaintiffs relied on the language of the White Pine Shores Plat, which called for the Property to include "all land to the water's edge of Lake Michigan," and detailed the extensive use of the beach by the Timberlane Terrace property owners over the preceding years (*id.*).

Approximately 25 of the named defendants in *Plastow v. Randall* asserted counterclaims against Plaintiffs for quiet title, prescriptive easement, adverse possession, acquiescence, trespass and quiet enjoyment (SMF ¶ 27). In support of their counterclaims, the Timberlane Terrace property owners alleged the following:

9.      The Timberlane Terrace Park is a riparian property with frontage on Lake Michigan.

10.      Since the creation of Timberlane Terrace in 1958, residents of the Plat have been using Timberlane Terrace Park to access [L]ake Michigan and recreate on the beach.

* * *

15.      The property boundaries and lot lines established by the Plat of Timberlane Terrace include the disputed area within the boundaries of the Timberlane Terrace Park.

* * *

7

44.     The placement of the rock/boulder line and the assertion of ownership over a substantial portion of the disputed area by [Plaintiffs] is inconsistent with and contrary to the boundaries of the Timberlane Terrace Park. . . .

(*Id.*).

On November 30, 2009, counsel for Plaintiffs in *Plastow v. Randall* resubmitted Plaintiffs' claim for coverage under the Policy to Defendant, indicating that

[b]ased on my review of the Title Commitment, any denial of coverage is baseless. Schedule B, Paragraph 11 of the Title Commitment states "Rights of the public and adjacent and abutting property owners in that portion of the premises lying along Grand Traverse Bay." The adjoining property owners' claim reaches far beyond the property "directly abutting Grand Traverse Bay." I believe the legal rights to the property directly abutting Grand Traverse Bay have been clearly established by the Michigan Supreme Court in Goeckel v. Glass, 473 Mich. 667. This is not an issue in the present case. Again, there is no basis for a good faith denial of my clients' claim. This is clearly an issue that their policy should cover. My client risks losing substantial property that Lawyer's originally insured. To date, my clients have spent over $100,000.00 defending this action.

(SMF ¶ 29).

Defendant responded through correspondence dated December 15, 2009 (SMF ¶¶ 22, 30). Acknowledging that it had the opportunity to consider the information previously submitted by Plaintiffs and the additional materials supplied by counsel, Defendant denied Plaintiffs' claim (*id.* ¶ 30). After citing the coverage exceptions set forth in the Policy, Defendant opined that the

[i]nformation contained in the submitted correspondence and pleadings stemming from this matter clearly indicate that most, if not all, of the rights claimed by the adjoining property owners to the above-referenced disputed portion of the Property relate to the area lying along Grand Traverse Bay. Thus, all loss or damage stemming from the assertion of these rights would be expressly excepted from coverage pursuant to Exception #11 of Schedule B of your Client's Policy.

Even assuming, arguendo, that these asserted rights and claims related to areas outside Grand Traverse Bay, a review of your claim clearly indicates these matters originally stem from a boundary line dispute resulting from claims under Riparian Law that are not matters of public record, but that would have been disclosed by an accurate survey and inspection of the affected area of the premises, not limited to the

area around Grand Traverse Bay. This is evidenced by the fact that the adjoining landowners original claims as to the inaccuracy of the boundary line dispute invoked the opinion of a riparian surveyor and did not reference issues that would be contained in the public records. Thus, this attack on title would be specifically excepted from coverage by Exception #2 of Schedule B of your Client's Policy as a boundary line dispute not disclosed of record and a matter which would be disclosed by an accurate survey and inspection of the Property.

*** 

The above-stated Policy provisions establish that coverage is not afforded for any matters arising in this Claim pursuant to the Conditions of your Client's Policy for reasons previously stated. Therefore, it remains the position of the Company that coverage for this Claim is denied. Therefore, the Company will not provide indemnification against loss or damage from matters raised in this Claim, nor will the Company provide a defense for the matters raised in this Claim.

(*Id.*).

On July 22, 2010, the state court in *Plastow v. Randall*, issued a Decision and Order (SMF ¶ 31). The state court found that Plaintiffs' Property and the Timberlane Terrace Park are riparian properties (*id.* ¶ 32). The court determined that extending the section line between Plaintiffs' Property and the Timberlane Terrace Park would eliminate the Park's water access and would do great injustice to certain parties in the litigation (*id.*). The state court appointed a surveyor, determining to equitably apportion the disputed area to preserve riparian access to all waterfront parcels of property (*id.*).

That same day, Plaintiffs filed this action against Defendant, seeking a declaratory judgment that Defendant was obligated to defend and indemnify them against the claims asserted in *Plastow v. Randall* and further asserting a claim for breach of contract as a result of Defendant's failure to do so. On September 24, 2010, the parties filed a joint request for a Pre-Motion Conference, proposing to file cross-motions for summary judgment on the liability issues, reserving the issue of damages (Dkt 6). The Court held a joint Pre-Motion Conference and Scheduling Conference on

9

November 30, 2010. This Court issued a briefing schedule on a motion for summary judgment from Plaintiffs (Dkt 15) as well as a Case Management Order (Dkt 16). Following the completion of discovery, the parties filed their motion papers (Dkts 24-33).

The parties have also since filed supplemental briefing, indicating that the surveyor appointed by the state court completed a survey and map delineating the manner by which the properties will be apportioned. Plaintiffs assert that the shape of their Property has changed in a "profound manner" inasmuch as they "no longer own a single inch of the lakeshore they used to own, their beach frontage having been shifted completely to the south of their old southern boundary" (Dkt 35 at 6). Defendant emphasizes that the survey instead shows that Plaintiffs retain nearly the same amount of frontage to which they asserted they were entitled (Dkt 36 at 2).

## II. ANALYSIS

### A. Motion Standard

A party may move for partial summary judgment, identifying the part of each claim on which summary judgment is sought. FED. R. CIV. P. 56(a). Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Id.* The Court must view the evidence and draw all reasonable inferences in favor of the nonmoving party. *Slusher v. Carson,* 540 F.3d 449, 453 (6th Cir. 2008); *Harbin-Bey v. Rutter,* 420 F.3d 571, 575 (6th Cir. 2005). After reviewing the whole record, the Court must determine "'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Booker v. Brown & Williamson Tobacco Co., Inc.*, 879 F.2d 1304, 1310 (6th Cir. 1989) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

10

The party moving for summary judgment has the initial burden of showing that no genuine issue of material fact exists. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986); *Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479 (6th Cir. 1989). Once the moving party has made such a showing, the burden is on the nonmoving party to demonstrate the existence of an issue to be litigated at trial. *Slusher,* 540 F.3d at 453.

## B. Discussion

The parties do not dispute that Michigan law governs the liability issues on which Plaintiffs seek partial summary judgment (Pls. Mot, Dkt 25 at 12; Defs. Resp., Dkt 30 at 7). Under Michigan law, interpretation of an insurance contract requires a two-step inquiry: first, a determination of coverage according to the general insurance agreement, and second, a decision regarding whether an exclusion applies to negate coverage. *Auto-Owners Ins. Co. v. Harrington*, 565 N.W.2d 839, 841 (Mich. 1997); *Hastings Mut. Ins. Co. v. Safety King, Inc.*, 778 N.W.2d 275, 291 (Mich. Ct. App. 2009).

In *Century Surety Co. v. Charron*, 583 N.W.2d 486, 488 (Mich. Ct. App. 1998), the Michigan Court of Appeals summarized the guidelines for interpreting insurance policies and exclusionary clauses as the following:

> An insurance policy is much the same as any other contract. It is an agreement between the parties in which a court will determine what the agreement was and effectuate the intent of the parties. *Auto-Owners Ins Co v. Churchman*, 440 Mich. 560, 566-567; 489 NW2d 431 (1992). When determining what the parties' agreement is, the court should read the contract as a whole and give meaning to all the terms contained the policy. The court must give the language contained in the policy its plain and ordinary meaning so that technical and strained constructions are avoided. *Royce v. Citizens Ins. Co.*, 219 Mich. App. 537, 542; 557 NW2d 144 (1996). If an insurance contract sets forth definitions, the policy language must be interpreted according to those definitions. *Cavalier Mfg. Co. v. Employers Ins. of Wausau (On Remand)*, 222 Mich. App. 89, 94; 564 NW2d 68 (1997). Where the language of an insurance policy is clear and unambiguous, it must be enforced as

11

written.  Courts must be careful not to read an ambiguity into a policy where none exists.  *Moore v. First Security Casualty Co.*, 224 Mich. App. 370, 375; 568 NW2d 841 (1997).

Exclusionary clauses in insurance policies are strictly construed in favor of the insured.  Coverage under a policy is lost if any exclusion in the policy applies to an insured's particular claims.  Clear and specific exclusions must be given effect because an insurance company cannot be liable for a risk it did not assume."  *Churchman*, *supra* at 567; *Frankenmuth Mut. Ins. Co. v. Masters*, [225 Mich. App. 51, 62; 570 NW2d 134 (1997), rev'd on other grounds 460 Mich. 105 (1999).]

## 1.  *Duty to Defend*

Plaintiffs contend that the Policy required Defendant to defend them in *Plastow v. Randall* and that Defendant breached the Policy by refusing to do so.  Summarizing the law with respect to an insurer's duty to defend an insured, the Michigan Court of Appeals has indicated that the duty of an insurer to defend its insured depends upon

the allegations in the complaint of the third party in his or her action against the insured.  The duty is not limited to meritorious suits and may even extend to actions which are groundless, false, or fraudulent, so long as the allegations against the insured even arguably come within the policy coverage.  An insurer has a duty to defend, despite theories of liability asserted against any insured which are not covered under the policy, if there are any theories of recover that fall within the policy.  The duty to defend cannot be limited by the precise language of the pleadings.  The insurer has a duty to look behind the third party's allegations to analyze whether coverage is possible.  In case of doubt as to whether or not the complaint against the insured alleges a liability of the insurer under the policy, the doubt must be resolved in the insured's favor.

*Detroit Edison Co. v. Michigan Mut. Ins. Co.*, 301 N.W.2d 832, 835 (Mich. Ct. App. 1981) (citations omitted).

Defendant does not dispute that the Policy generally required it to defend Plaintiffs in title matters.  The issue with the duty-to-defend coverage in this case involves the second step of the inquiry, whether any of the coverage exceptions set forth in Schedule B of the Policy negate the coverage otherwise available under the general terms of the Policy.  Specifically, Defendant relies

12

on two coverage exceptions set forth in Schedule B, above:  Exception #2, excepting from coverage "boundary line disputes not disclosed of record"; and Exception #11, excepting from coverage "[r]ights of . . . adjacent and abutting property owners in that portion of the premises lying along Grand Traverse Bay."

Turning first to Exception #11, Plaintiffs argue that whether this exception applies to the claims brought against them in *Plastow v. Randall* and, therefore, justifies Defendant's refusal to defend Plaintiffs, turns on the phrase "that portion of the premises lying along Grand Traverse Bay" and, more precisely, on the word "along" (Dkt 25 at 15).  According to Plaintiffs, because the claims against them in *Plastow v. Randall* implicate their title to and ownership of much more than just the west boundary of their Property, Exception #11 does not justify Defendant's failure to defend Plaintiffs (*id.*).  Plaintiffs point out that from the initial Luther letter in early July 2008 through the Affidavit in August 2008 and the counterclaims in September 2008, the Timberlane Terrace property owners consistently sought to establish their title to and ownership of "a broad swath of the Property lying east of Lake Michigan, between the north and south boundaries established by the White Pine Shore Plat" (*id.* at 16).

Defendant argues that Exception #11 excepts coverage in this case because the disputed area lies along Grand Traverse Bay (Dkt 30 at 9).  Defendant argues that Plaintiffs' narrow reading of the exception would render the exception entirely void because there would be no reason to include the exception in the Policy where the only property abutting the west boundary line is Grand Traverse Bay (*id.*).  Defendant points to the Affidavit, where the Disputed Area was described as an area starting near the creek at the park's northern property line and following the shore 75 feet to the south (*id.* at 10).

13

Although clear and specific exclusions must be given effect, Exception #11 here does not clearly or specifically exclude from the Policy's duty-to-defend coverage the allegations by the Timberlane Terrace property owners against Plaintiffs.  The allegations by the Timberlane Terrace property owners arguably come within the Policy coverage inasmuch as the counterclaims against Plaintiffs (quiet title, prescriptive easement, adverse possession, acquiescence, trespass and quiet enjoyment) concerned more than "that portion of the premises lying along Grand Traverse Bay." Defendant could have more clearly and specifically drafted the exception to exclude coverage, and its failure to do so inures to Plaintiffs' benefit, not Defendant's benefit.  *See Cincinnati Ins. Co. v. Zen Design Group, Ltd.*, 329 F.3d 546, 552 (10th Cir. 2003) (applying Michigan law and concluding, "Any doubts as to the insurer's liability must be resolved in favor of the insured.").  The Court holds, as a matter of law, that the duty-to-defend coverage otherwise provided by the general terms of the Policy was not negated by Exception #11 on these facts.

Turning next to Exception #2, Plaintiffs argue that whether this exception applies to exclude the claims in *Plastow v. Randall* turns on whether the underlying litigation involved a "boundary line dispute" and, if so, whether the boundary lines giving rise to the dispute were "not disclosed of record" (Dkt 25 at 17).  Plaintiffs assert that because the claim upon which the Timberlane Terrace property owners have prevailed against Plaintiffs in *Plastow v. Randall* involved much more than a boundary line dispute and the basis for that claim was, in fact, disclosed of record, Exception #2 does not justify Defendant's failure to defend Plaintiffs (*id.*).  Alternatively, Plaintiffs argue that even if the claims asserted against Plaintiffs by the Timberlane Terrace property owners constitute a "boundary line dispute," the fact remains that it was a boundary line dispute disclosed of record, rendering Defendant's reliance on Exception #2 unwarranted (*id.* at 18).

14

Defendant argues that even assuming arguendo that the claims of Timberlane Terrace pertain to "portions of the premises outside of Grand Traverse Bay," such rights and claims are not shown of record and are therefore excepted by Policy Exception #2 (Dkt 30 at 10).  According to Defendant, the rights and claims of Timberlane Terrace to the disputed area can be summarized in two ways: (1) claims based on Timberlane Terrace's historical use of the Disputed Area, and (2) the extension of Timberlane Terrace Park's boundary lines to the high water mark of Grand Traverse Bay (*id.*).  As evidence that the Timberlane Terrace claims were not based on something of record, Defendant points to the fact that the Timberlane Terrace owners' claims are based on adverse possession and acquiescence theories for which riparian experts were retained (*id.* at 11).

Even assuming arguendo that the allegations in *Plastow v. Randall* amount to a boundary dispute, the undisputed material facts demonstrate that the dispute was based on publicly disclosed and recorded plats.  The "Description of Land Platted" relevant to Plaintiffs' Property states that the description is "intended to include all land to the water's edge of said Lake Michigan" (SMF ¶ 2).  Conversely, the Timberlane Terrace property owners alleged that "the property boundaries and lot lines established by the Plat of Timberlane Terrace include the disputed area within the boundaries of the Timberlane Terrace Park" (*id.* ¶ 27).  As Plaintiffs argue in their Reply (Dkt 32 at 5-8), the fact that the Timberlane Terrace property owners asserted theories of recovery against Plaintiffs in *Plastow v. Randall* based on historical use does not relieve Defendant of its contractual obligation to defend Plaintiffs.  "It is well settled that 'if the allegations of the underlying suit arguably fall within the coverage of the policy, the insurer has a duty to defend its insured.'"  *Radenbaugh v. Farm Bureau Gen. Ins. Co.*, 610 N.W.2d 272, 275 (Mich. Ct. App. 2000) (quoting *Royce v. Citizens Ins. Co.*, 557 N.W.2d 144, 147 (Mich. Ct. App. 1996)).

In sum, the claims asserted against Plaintiffs by the Timberlane Terrace property owners were covered by the general terms of the Policy, and the coverage was not negated by the coverage exceptions on which Defendant relies.  The Court concludes, as a matter of law, that the Policy required Defendant to defend Plaintiffs in *Plastow v. Randall* and that Defendant's failure to do so constituted a breach of the agreement.

**2.    Duty to Indemnify**

Plaintiffs further contend that the Policy required Defendant to indemnify them for any losses they incurred as a result of the apportionment decision in *Plastow v. Randall* and that Defendant breached the Policy by refusing to do so (Dkt 25 at 20).  Plaintiffs argue that the claims upon which the Timberlane Terrace property owners prevailed against Plaintiffs in *Plastow v. Randall* are covered by the Policy and not subject to any coverage exception (*id.*).  According to Plaintiffs, because the state court determined that title to and ownership of that beach is actually vested in the Timberlane Terrace property owners (through their joint ownership of the Timberlane Terrace Park), not Plaintiffs, the size and shape of Plaintiffs' Property will be substantially altered, with the Property's north and south boundaries shifting to the south and Plaintiffs' beach and shore access shifting to the south, with corresponding damages in the form of diminished property value and loss of lake frontage accruing to Plaintiffs (*id.*).

Defendant did not separately address its contractual duty to indemnify.  Defendant relies on Exceptions #11 and #2 as excluding coverage under the Policy for both its duty to defend or indemnify on these facts.

This Court previously concluded that the duty-to-defend coverage afforded Plaintiffs was not negated by either exclusion, and Defendant offers no basis for reaching a contrary conclusion

16

regarding the duty-to-indemnify coverage of the Policy.  Accordingly, the Court concludes, as a matter of law, that the Policy also requires Defendant to indemnify Plaintiffs for the losses they incurred in *Plastow v. Randall* and that Defendant's failure to do so constituted a breach of the agreement.

### III.  CONCLUSION

For the foregoing reasons, the Court determines that Plaintiffs' Motion for Partial Summary Judgment (Dkt 24) is granted.  An Order will be entered consistent with this Opinion.  Barring the parties' ability to stipulate to an amount of damages and reasonable attorney fees and related costs incurred by Plaintiffs, a Final Pretrial Conference and Trial on these remaining issues will be noticed.

DATED: December  20 , 2011

/s/ Janet T. Neff
JANET T. NEFF
United States District Judge

17